UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT  SHORT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:11-cv-00545-SEB-MJD |
| NORTH POINTE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| NORTH POINTE INSURANCE COMPANY, | ) | |
| | ) | |
| Counter and Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT SHORT, JANET SHORT, and JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Counter and Third-Party Defendant. | ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION
FOR LEAVE TO FILE AMENDED COMPLAINT**

This cause is before the Court on the summary judgment motions filed by Third

Party Defendant JP Chase Morgan Bank, N.A. ("Chase") [Docket No. 63] and Plaintiff

Robert Short and Third-Party Defendant Janet Short ("the Shorts") [Docket No. 65], both

on July 16, 2012, and the cross-motion for summary judgment filed by Defendant and

Counter and Third-Party Plaintiff, North Pointe Insurance Company ("North Pointe")

[Docket No. 69], filed on August 17, 2012.  Also before the Court is the Shorts' Motion

1

for Leave to File Amended Complaint and Cross-Claim for Declaratory Judgment

[Docket No. 100], filed on November 7, 2012, which seeks to add a bad faith claim

against North Pointe and assert a cross-claim for declaratory relief against Chase.

For the reasons detailed in this entry, the Court DENIES Chase's motion for

summary judgment and GRANTS IN PART and DENIES IN PART the Shorts' and

North Pointe's motions.  The Shorts' motion to amend is GRANTED.

## Factual Background

**Damage to the Property**

In 1997, the Shorts purchased a home located at 9912 Mapleton Court, Fishers,

Indiana 46038 ("the Property").  Chase issued a mortgage to Robert A. Short and Janet L.

Short, Loan Number M 0906966359 ("Mortgage") for the Property.  In the summer of

2009, the Shorts, along with their two daughters and Mr. Short's mother, traveled to

Florida.  The Shorts were unsure how long they would be staying in Florida as the trip

was prompted by health concerns of Mr. Short's mother and one of the Shorts' daughters.

The Shorts packed clothing and incidental possessions for the trip but did not take their

furniture or other possessions to Florida.  Because their long term plans were uncertain,

the Shorts obtained their daughters' school records from their respective schools in

Fishers, Indiana.  The Shorts did not put the Property up for sale when they left for

Florida and they hired a neighbor to maintain the lawn and look after the Property in their

absence.

While in Florida, the Shorts initially signed a short-term, three-month lease for a condominium in Melbourne, Florida.  Since that time, the Shorts have remained in Florida, renewing the lease in six-month increments.  Not long after they arrived in Florida, the Shorts enrolled their daughters in Melbourne schools.

In late July or early August 2009, Mr. Short returned to the Property.  At that time, he checked on the security of the Property, collected more of his daughters' clothing, and prepared the Property for an undetermined period of absence.  Beyond their clothing and a few small possessions, the Shorts once again did not move their furniture or other personal property to Florida.  Mr. Short also maintained the utilities and phone at the Property.  Mr. Short's office remained in the Fishers home and, according to Mr. Short, he planned to return with some regularity in the fall.  During his late summer 2009 visit to the Property, Mr. Short turned on the heat in case the weather turned cold before he returned.  Mr. Short testified that, although the thermostat went lower, he turned the heat to 42 degrees Fahrenheit because he wanted to keep the Property temperature set in the 40s.

In late March 2010, a neighbor who was watching the Property telephoned the Shorts to inform them that there was a very large icicle hanging from the side of the house.  Upon receiving this report, Mr. Short returned to the Property and found that the house had suffered severe water damage.[1]  When he first arrived, Mr. Short investigated to determine the source of the damage with a plumber from Mister Quik.  The Mister

---

[1] Although Mr. Short testified that he had planned to return regularly in the fall, he apparently had not visited the Property between his late summer visit in 2009 and March 2010.

Quik plumber identified the cause of the water damage to be a broken copper water pipe. According to the Shorts' expert, Tim Dickson, the cause of the water damage was from water escaping a frozen burst copper pipe in the master bathroom.  In his report, Mr. Dickson concluded: "Based on my visual inspection of the failed copper water supply pipe, it is my opinion the copper pipe ruptured due to the water within the pipe freezing. The water expanded as it froze within the pipe causing the copper pipe to tear longitudinally along the length of the pipe."  T. Dickson Aff., Exh. C at 3.

North Pointe's expert, Tom Wood, agrees that the water loss at issue was due to a frozen pipe.  In his report, Mr. Wood included the following findings:

1.  The extensive water damage observed inside the residential structure at the time of our site investigations was the result of a pipe break in the second floor master bathroom.

2.  The pipe break was the result of water freezing inside the copper pipe that supplies water to the valve of the master bathroom whirlpool tub.

3.  The freeze and break of the copper supply pipe occurred as a result of inadequate heat in the structure.

4.  Given the low heat condition inside the subject dwelling, it is more likely than not that multiple freeze cycles affecting the water supply pipe for the whirlpool tub occurred prior to the failure of the pipe.

Tom Wood Aff., Exh. B Water Damage Investigation Report at 2.  Mr. Wood's report further provided:

Based on our experience and research, the minimum low heat setting for a residential structure that has not been winterized is 55 [degrees].  Obtaining a lower safe heat setting than 55 [degrees] would require evaluation of the structure and monitoring for freezing conditions inside the structure.  It is our technical opinion, therefore, that a heat setting of 42 [degrees] is not

4

appropriate for a residential structure in this geographic area.  It is also our technical opinion that the low heat setting of 42 [degrees] did not provide sufficient heat in the subject dwelling to prevent the water supply pipes from freezing and was the underlying cause of the failure of the copper water supply pipe under the whirlpool tub.

*Id.* at 3.

**The Insurance Policy**

At the time the water damaged the Property, it was insured by North Pointe, which had issued to Mr. Short an insurance policy ("the Policy"), Policy Number NPHM303743, that provided property and liability coverage from October 23, 2009 through October 23, 2010.  The Policy contained limits of $286,000 for the dwelling and $143,000 for personal property, and had a $1,000 deductible.  The Policy listed Chase as the first mortgagee on the Property.

The Policy provisions relevant to this litigation include the following:

**SECTION I – PROPERTY COVERAGES**

**A.    Coverage A – Dwelling**

    **a.**    The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling …

***

**SECTION I – PERILS INSURED AGAINST**

We insure for direct physical loss to the property described in Coverages **A, B** and **C** caused by any of the following perils unless the loss is excluded under Section **I** – Exclusions.

***

**12.    Accidental Discharge Or Overflow Of Water Or Steam**

5

**a.**  This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance. …

**b.**  This peril does not include loss:

**(1)** On the "residence premises", if the dwelling has been vacant for more than 60 consecutive days immediately before the loss.

\*\*\*

**(3)** Caused by or resulting from freezing except as provided in Peril Insured Against **14.** Freezing;

\*\*\*

**d.**  Section **I** – Exclusion **3.** Water Damage, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

\*\*\*

**14.  Freezing**

**a.**  This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

**(1)** Maintain heat in the building; or

**(2)** Shut off the water supply and drain all systems and appliances of water.

\*\*\*

**SECTION I – CONDITIONS**

\*\*\*

**K.  Mortgage Clause**

1.      If a mortgagee is named in this policy, any loss payable under
        Coverage **A** or **B** will be paid to the mortgagee and you, as
        interests appear ….

2.      If we deny your claim, that denial will not apply to a valid
        claim of the mortgagee …

                                    ***

4.      If we pay the mortgagee for any loss and deny payment to
        you:

        **a.**      We are subrogated to all the rights of the mortgagee
                    granted under the mortgage on the property; or

        **b.**      At our option, we may pay to the mortgagee the whole
                    principal on the mortgage plus any accrued interest.  In
                    this event, we will receive a full assignment and
                    transfer of the mortgage and all securities held as
                    collateral to the mortgage debt.

5.      Subrogation will not impair the right of the mortgagee to
        recover the full amount of the mortgagee's claim.

Docket No. 32-1 (Insurance Policy).


**The Claim and Damage Estimates**

On March 26, 2010, the Shorts notified North Pointe by telephone of their claim

based on the water damage, and North Pointe acknowledged notice of the claim by letter

issued on that same date.  In that letter, North Pointe identified the "Claim Description"

as "Burst pipe, water dmg."  Shorts' Exh. 9 (March 26, 2010 letter).  North Pointe

assigned an independent adjuster, Marshall Simmons of Claims Consultants, LLC, to

adjust the claim.  On March 31, 2010, Mr. Simmons inspected the home and identified

the "Peril" as "Plumbing Leak."  Shorts' Exh. 11 (Initial Adjuster Report) at 1.  At that

time, Mr. Simmons identified the "Cause & Origin" of the water damage as follows:

7

> This water loss occurred sometime in the month of March while the insured
> and his family were in Florida. The damage was caused by an upstairs
> plumbing leak in the master bathroom. First inspection revealed that
> several ceilings were collapsed on the first floor due to a long term water
> leak from above.

*Id.* at 2. Mr. Simmons described the "Damage/Scope of Repairs" as follows:

> Many rooms have collapsed ceilings, mild to severe mold growth on the
> walls and flooring, possessions etc. The basement was also affected and
> still has water in it. The mechanicals appear to be damaged in the
> basement. The insured is claiming a larger amount of contents damaged.
> The risk is unlivable due to the severity of the damage and the amount of
> mold throughout.

*Id.* Mr. Simmons also included a photographic account of the damages sustained at the

Property. *Id.* at Photo Sheet 1-56.

On May 13, 2010, Mr. Simmons submitted his final Adjuster Report to North

Pointe. In his report, Mr. Simmons identified the "Peril" as "Water Leak" and the Cause

& Origin" as follows:

> This water loss occurred sometime between the 3 weeks before 3/26/10
> while the insured was in Florida on vacation. The damage was caused by
> water escaping from the plumbing in the upstairs master bathroom. First
> inspection revealed water had leaked from the bathtub plumbing for many
> days and traveled down and across the risk causing severe damages to
> many other rooms in the risk. Water damages and then resulting mold
> damages followed. Insured provided pictures and estimate from plumber
> verifying cause and origin of plumbing leak that adjuster reviewed and
> forwarded to North Pointe Insurance.

Exh. 12 (Final Adjuster Report) at 2. Mr. Simmons included in his final report an

estimate of the replacement cost to repair the Property at $95,075.96. This amount did

not include the contents of the Property.

In addition to Mr. Simmons's report, North Pointe also received an additional independent adjuster evaluation from Midwest Remediation, Inc., submitted on behalf of the Shorts.  On April 2, 2010, Mark Vaillancourt from Midwest Remediation inspected the Property.  Mr. Simmons met with Mr. Vaillancourt at the Property on April 6, 2010. Mr. Simmons, on behalf of North Pointe, requested that Midwest Remediation provide separate estimates for demolition and reconstruction, cleaning of structural framing, and emergency mitigation.  Midwest Remediation estimated that demolition, cleaning, and construction repairs would cost $181,315.25, emergency services and mitigation would cost $36,526.92, and cleaning and remediation post-demolition would cost $12,666.87, for a total of $230,509.04.  Midwest Remediation also worked with Mr. Short to prepare an inventory of personal property damaged in the Property, and estimated the personal property damage to be at least $127,433.00.  In order to prevent further deterioration at the Property, Midwest Remediation set up and monitored dehumidifiers in the house. The current balance owed to Midwest Remediation for those services is $70,293.92, and Midwest Remediation has a lien against the Property for this work.

**Denial of the Claim**

On April 14, 2010, North Pointe notified Mr. Short that it was "presently investigating the facts and circumstances surrounding the claim" and reserved its right to decline coverage "in the event that your failure to follow the terms and conditions of the policy prejudices our investigation."  Shorts' Exh. 14 at 1.  In that letter, North Pointe identified the Policy's "Fungus, Rust, Wet or Dry Rot, or Bacteria Limited Coverage,"

9

which provides up to $5,000 in coverage for loss caused by "'fungus', rust, wet or dry rot

or bacteria." *Id.* The letter also stated:

> The purpose of this notice is to permit an investigation of the subject loss
> and of coverage without waiver or invalidations of any terms, conditions or
> defenses under [sic] policy issued by North Pointe Insurance Company, and
> to preserve all rights of North Pointe Insurance Company.  It is further the
> purpose of this notice to permit an investigation as aforesaid without North
> Pointe Insurance Company being later estopped from asserting defenses
> and rights available to it under the policy of insurance or under Michigan
> Law.

*Id.* at 3.  In this reservation of rights letter, North Pointe identifies the claim as "Burst

pipe, water dmg." *Id.* at 1.

On August 10, 2010, North Pointe renewed the Policy, providing coverage from

October 23, 2010 through October 23, 2011.  On September 15, 2010, North Pointe

denied the Shorts' claim under the vacancy provision contained in the "Accidental

Discharge or Overflow of Water or Steam" coverage.  The denial letter states: "Your

claim for the accidental discharge of water loss at 9912 Mapleton Court, Fishers, IN

46037 on March 24, 2010 is denied based upon the exclusionary policy insurance

contract language for vacant or unoccupied premises."  Shorts' Exh. 16 at 2.  Under the

terms of the Policy, the "vacancy provision" applies solely to the "Accidental Discharge

or Overflow of Water or Steam" coverage provision.  North Pointe did not address

whether there was coverage under the "Freezing" peril provision of the Policy.  Although

North Pointe had renewed the Policy on August 10, 2010 to provide coverage through

October 23, 2011, on October 28, 2010, North Pointe sent Mr. Short a "Notice of

Cancellation."  The notice provided that the reason for the cancellation was "dwelling is vacant/change in occupancy."  *Id.*

**Inaccuracies in Policy Application**

According to Mr. Short, when he applied for the Policy with North Pointe in September 2007, he did not complete the application himself.  Instead, the information contained in the application was already filled in when Mr. Short came to the agent's office.  Although Mr. Short signed the application, it contained a number of errors.  One error germane to this litigation is the response to Question 2 on the application, which asks: "Bankruptcy or Foreclosure proceeding ever filed?"  Shorts' Exh. 2 at 2.  The "NO" box is checked on the application, but all parties now concede this is incorrect.  At his August 10, 2010 deposition, Mr. Short testified that he had filed for bankruptcy in 1999 and that he had two separate foreclosure actions filed against him, one on the insured property and another in Florida.  Short Dep. at 18, 20-23.  According to North Pointe, had it known the correct answer to this question, it would not have issued the Policy to Mr. Short.

**Instant Litigation**

On March 11, 2011, Mr. Short filed this declaratory judgment action against North Pointe in Marion Superior court in order to determine coverage under the Policy.  The case was removed to our court on April 22, 2011.  On May 26, 2011, Chase filed a claim for coverage under the Policy as well, having previously filed a foreclosure action on the

11

Property on May 19, 2011 in Hamilton Superior Court.  On December 15, 2011, North

Pointe filed its counterclaim against Mr. Short and a third party complaint against Chase

and Janet Short.  Chase filed its summary judgment motion on July 16, 2012, and the

Shorts filed their summary judgment motion that same day.  On August 17, 2012, North

Pointe filed its cross-motion for summary judgment.  After the cross-motions for

summary judgment were fully briefed, on November 7, 2012, the Shorts filed their

motion to amend the complaint.

## Legal Analysis

I.      **Cross Motions for Summary Judgment**[2]

      A.      **Standard of Review**

      Interpretation of written contracts, such as insurance policies, is typically a matter

of law and particularly appropriate for resolution by summary judgment.  *Hurst-Rosche*

*Engineers, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995).

Summary judgment is appropriate when the record shows that there is "no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In

deciding whether genuine issues of material fact exist, the court construes all facts in a

light most favorable to the non-moving party and draws all reasonable inferences in favor

of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[2] Because the Shorts' subsequently filed motion to amend does not affect the claims on which the
parties have moved for summary judgment, we address the cross-motions first.

Because these are cross-motions for summary judgment and the same Rule 56 standards apply, our review of the record requires us to draw all inferences in favor of the party against whom a particular issue in the motion under consideration is asserted. *See O*=*Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

### B.    Interpretation of Insurance Contracts Under Indiana Law[3]

The interpretation of an insurance policy is a matter of law. *Westfield Companies v. Knapp*, 804 N.E.2d 1270, 1273-74 (Ind. Ct. App. 2004). Insurance contract provisions are subject to the same rules of construction as other contracts. Thus, courts must construe insurance policies as a whole, rather than considering individual words, phrases, or paragraphs. *Id.* at 1274. If the contract language is clear and unambiguous, it should be given its plain and ordinary meaning. *Newnam Mfg., Inc. v. Transcon. Ins. Co.*, 871 N.E.2d 396, 401 (Ind. Ct. App. 2007). Additionally, "[i]nsurance companies are free to limit their liability, so long as they do so in a manner consistent with public policy as reflected by case or statutory law." *Gheae v. Founders Ins. Co.*, 854 N.E.2d 419, 423 (Ind. Ct. App. 2006). Thus, "[a]n insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer=s liability." *Amerisure, Inc. v. Wurster Const. Co., Inc.*, 818 N.E.2d 998, 1002 (Ind. Ct. App. 2004).

---

[3] The parties and we agree that Indiana law governs this case.

A contract is ambiguous "only when it is susceptible to more than one interpretation and reasonable persons would honestly differ as to its meaning." *Bedwell v. Sagamore Ins. Co.*, 753 N.E.2d 775, 779 (Ind. Ct. App. 2001) (citation omitted).  A policy term is not ambiguous "simply because a controversy exists, and one party asserts an interpretation contrary to that asserted by the opposing party." *Id.*  There is no requirement that all policy terms be defined and the fact that a term is not defined does not necessarily render it ambiguous.  *Harden v. Monroe Guaranty Ins. Co.*, 626 N.E.2d 814, 817 (Ind. Ct. App. 1993).  "Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence."  *Bedwell*, 753 N.E.2d at 779.  Policy language is construed strictly against the insurer when the dispute involves the insurer and its insured, but when the dispute is between a third party and the insured, the court determines the intent of the contract "from a neutral stance."  *Id.*

## C.    Claims Between North Pointe and the Shorts

### 1.  Misrepresentations on the Policy Application

We turn first to North Pointe's argument that the Policy should be "rescinded *ab initio*" as a result of material misrepresentations in the application.  It is undisputed that Mr. Short signed the application completed by his insurance agent for the Policy at issue in this case, in which Mr. Short represented that he had never previously filed for bankruptcy, when in fact he had filed for bankruptcy approximately ten years earlier. North Pointe contends that it would not have insured the Shorts' residence had it been

aware at the time the Shorts applied for insurance that Mr. Short had previously filed for

bankruptcy.  Thus, North Pointe argues that the Policy should be rescinded.

It is well established under Indiana law that "a material misrepresentation or

omission of fact in an insurance application, relied on by the insurer in issuing the policy,

renders the coverage voidable at the insurance company's option."  *Colonial Penn Ins.*

*Co. Guzorek*, 690 N.E.2d 664, 672 (Ind. 1997) (citation omitted).  An insurance policy

"is not rendered absolutely void by reason of false answers to questions contained in the

application which materially affect the risk undertaken by the insurer, but in such a case,

the contract is voidable at the election of the insurer."  *Am. Family Mut. Ins. Co. v.*

*Kivela*, 408 N.E.2d 805, 810 (Ind. Ct. App. 1980) (citations omitted); *accord Gary Nat.*

*Bank v. Crown Life Ins. Co.*, 392 N.E.2d 1180, 1181 (Ind. Ct. App. 1979) ("When a party

asserts that he has been defrauded into entering a contract by relying on material

misrepresentation, the contract is voidable and the insurer can elect to either rescind it on

the basis of fraud or affirm the transaction.") (citation omitted).  In order to rescind a

policy on the grounds of material misrepresentation in an application, an insurer

generally "must first make a tender of the full amount of premiums paid under the policy.

This is to restore the parties to the position that they were in prior to the contract by

returning the consideration the insurance company has received."[4]  *French v. State Farm*

*Fire & Cas. Co.*, 950 N.E.2d 303, 311 (Ind. Ct. App. 2011) (citations omitted).  An

---

[4] The only exception to this rule, to wit, in cases in which the insurer has paid a claim greater in
amount than the premiums paid, is inapplicable here.  *See Am. Std. Ins. Co. v. Durham*, 403
N.E.2d 879, 881 (Ind. Ct. App. 1980).

insurance company desiring to exercise its option to rescind the contract is required to act promptly in doing so.  *See Buehler Corp. v. Home Ins. Co.*, 495 F.2d 1211, 1214 (7th Cir. 1974) (citing *Aetna Ins. Co. of Hartford, Conn. v. Robinson*, 10 N.E.2d 601 (Ind. 1937)).

Here, by its actions, North Pointe has elected to affirm the Policy, and thus, has waived its opportunity to challenge any misrepresentations.  North Pointe first learned of the misrepresentation in August 2010, when Mr. Short's deposition was taken in this case and he testified that he had in fact filed for bankruptcy prior to submitting his insurance application.  However, North Pointe waited two years thereafter to raise the issue of rescission, until August 17, 2012, when it argued for the first time in its response brief that the Policy should be rescinded.  Moreover, at no point during this two year period did North Pointe return any of the premiums paid by the Shorts for the Policy nor did it offer to do so.  Given North Pointe's dilatoriness in raising this issue, coupled with its failure to make a tender of premiums, North Pointe's failure to act promptly to rescind the Policy once learning of the misrepresentation acts as a bar to its claim that the contract is void.[5]  *See Allianz Ins. Co. v. Guidant Corp.*, 884 N.E.2d 405, 414-15 (Ind. Ct. App. 2008) (holding that an insurer who had retained the insurance premiums had affirmed the contract and waived the right to argue the contract was void).  Accordingly,

---

[5] North Pointe's cancellation of the Policy on October 28, 2010, approximately two months after learning of the misrepresentation, does not affect our analysis.  Initially, cancellation is a distinct remedy from rescission and it is clear that North Pointe cancelled the Shorts' policy, rather than rescind it.  The October 28, 2010 letter is titled "NOTICE OF CANCELLATION" and explicitly refers to "cancellation" on multiple occasions throughout the body of the text.  The letter also makes no mention of Mr. Short's bankruptcies, foreclosures, or any other alleged mistake on the application, referencing instead an entirely different reason for the cancellation.  The fact that North Pointe cancelled the Shorts' policy on unrelated grounds does not affect whether North Pointe rescinded the Policy based on the misrepresentations on the application.

the Shorts are entitled to summary judgment holding that the Policy is not void as a result
of the misrepresentations in the application.

## 2.   Coverage Under the Named Perils in the Policy

The Policy is a "named perils" policy, providing coverage "for direct physical loss
to the property described in Coverages **A**, **B** and **C** caused by any of the following perils
unless the loss is excluded under Section I – Exclusions."  The Shorts contend that their
claim falls within both the Freezing and the Accidental Discharge provisions of the
Policy.  We address these provisions in turn.

### i.        Freezing Peril

It is undisputed that the damages to the Property at issue in this litigation were
caused by a frozen copper pipe that burst in the master bathroom.  Under the Policy,
coverage under the Freezing peril applies only if the policyholder used "reasonable care
to: (1) Maintain heat in the building; or (2) Shut off the water supply and drain all
systems and appliances of water."  Shorts' Exh. 3 at 12.  The Shorts concede that they did
not shut off the water supply, but maintain that Mr. Short used reasonable care to
maintain heat in the building, and thus, that their claim falls within the named freezing
peril under the Policy.  North Pointe rejoins that the evidence conclusively establishes
that Mr. Short failed to use "reasonable care" to maintain heat in the home.

This disagreement clearly embodies a genuine issue of material fact regarding
whether "reasonable care" was used by Mr. Short to maintain heat in the home.  The

17

Shorts maintained the utilities throughout the period during which they were absent from the Property and there is no evidence that the heat was not on in the home.  Mr. Short testified that, before he left the home to return to Florida in August 2009, he turned on the heat so that it would "kick on" if there were "any cool nights" while the home was unoccupied.  Shorts' Exh. 6 (R. Short Sworn Statement) at 47.  He did lower the thermostat, however, to a degree of 42 degrees Fahrenheit.  Although the thermostat could go lower, Mr. Short testified that he intentionally kept it "in the 40s."  *Id.* at 56.

North Pointe's expert, Tom Wood, has opined that "the minimum low heat setting for a residential structure that has not been winterized is 55 [degrees]," concluding that "it is our technical opinion, therefore, that a heat setting of 42 [degrees] is not appropriate for a residential structure in this geographic area."  Wood Report at 3.  However, under Indiana law, policy terms otherwise undefined in the policy "are interpreted from the perspective of an ordinary policyholder of average intelligence."[6] *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 936 (Ind. Ct. App. 1999).  Thus, the question at bar is not what an expert or average contractor believes to be an appropriate heat setting, but rather whether an ordinary policyholder of average intelligence would think that Mr. Short used "reasonable care to maintain heat."  Expert testimony may be helpful to aid the trier of fact in making this determination, but considered alone it is not dispositive.[7]

---

[6] North Pointe quotes *Harden v. Monroe Guaranty Ins. Co.*, 626 N.E.2d 814, 817 (Ind. Ct. App. 1993) for the proposition that undefined policy terms are interpreted from the "perspective of an ordinary policyholder of *above* average intelligence." Docket No. 88 at 2 (emphasis added). However, that language does not appear in *Harden*.

[7] Because we find that Mr. Wood's expert testimony would be helpful to the trier of fact, we decline to strike his testimony as the Shorts requested in their reply brief.

Given the steps Mr. Short took to heat the home during the family's absence, it is clear that reasonable minds could differ as to whether keeping the temperature ten degrees above the freezing point of 32 degrees Fahrenheit constitutes "reasonable care" to maintain heat in the Property.  Accordingly, summary judgment is not available to either party on this issue.

### ii.      Accidental Discharge Peril and Vacancy Exclusion

The Shorts argue that their claim also falls within the coverage provision for Accidental Discharge Or Overflow of Water or Steam, which provides coverage for "accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protection sprinkler system or from within a household appliance."  Shorts' Exh. 3 at 12.  North Pointe denied the Shorts' claim under the vacancy exclusion to the Accidental Discharge peril, which provides in relevant part that loss is not covered "[o]n the 'residence premises,' if the dwelling has been vacant for more than 60 consecutive days immediately before the loss."  *Id.*

The parties dispute whether the term "vacant" is synonymous with the term "unoccupied," and thus, whether the vacancy exclusion applies here.  However, we need not address the parties' arguments on this point because, as North Pointe argues, the Accidental Discharge peril also excludes loss "caused by or resulting from freezing except as provided in Peril Insured against 14. Freezing …."  *Id.*  Both parties agree that the loss at issue here was caused by a frozen pipe in the master bathroom.  Thus, under the clear terms of the Policy, the only possible coverage available is under the freezing

19

peril provision, not the accidental discharge provision.  Accordingly, North Pointe is entitled to summary judgment on its claim that there is no coverage under the accidental discharge provision of the Shorts' policy.

### D.  Claims Between North Pointe and Chase

#### 1.  Whether Chase Is an Additional Insured or Mortgagee

Initially, there is some dispute between the parties regarding whether Chase is an additional insured on the Policy or a mortgagee.  Our review of the Policy shows that it provides codes that indicate "M" is for "First Mortgagee" and "A" is "Additional Insured."  On the Policy, an "M" is listed after "Loan Number" by Chase's name.  Moreover, Chase's own Notice of Claim submits the matter under the "mortgage clause" and contains no reference to being an "Additional Insured."  Given these facts undisputed facts, we hold that Chase is the first mortgagee under the Policy and not an additional insured.

#### 2.  Coverage

The Policy at issue here contains a standard mortgage clause, providing that: "**1.** If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you, as interests appear … **2.** If we deny your claim, that denial will not apply to a valid claim of the mortgagee…."  Shorts' Exh. 3.  Chase contends that the Policy's mortgage clause creates an independent contract between it and North Pointe that entitles Chase to payment "regardless of the mortgager's acts or omissions."

20

*Property Owners Ins. Co. v. Hack*, 559 N.E.2d 396, 400 (Ind. Ct. App. 1990) (citations omitted).  Accordingly, Chase contends that it is owed insurance proceeds under the Shorts' Policy regardless of whether acts or omissions by the Shorts, to wit, failing to use reasonable care to maintain heat in the Property, caused the loss to be excluded from the coverage terms of the Policy.

It is true that certain circumstances, such as an insured's misrepresentations in obtaining an insurance policy, do not affect the separate insurance agreement between the insurance company and mortgagee.  *See Ocwen Loan Servicing, LLC v. Nationwide Mut. Fire Ins. Co.*, 1:07-cv-01449-SEB-DML, 2012 WL 1067854, at *7-8 (S.D. Ind. Mar. 29, 2012).  However, although the mortgage clause at issue here provides that a denial of the insured's claim does not necessarily apply to the mortgagee, it still requires that the mortgagee have a "valid claim" for coverage.  Thus, contrary to Chase's contention, Chase is not automatically entitled to coverage under the mortgagee clause.  To have a "valid claim" under the Policy at issue here, coverage must fall under a named peril. Because genuine issues of material fact remain regarding whether the loss at issue here is payable as a valid claim under the named perils in the Policy, neither Chase nor North Pointe is entitled to summary judgment on this issue.

### 3.  Estoppel

Chase alternatively argues that, even if the court finds that North Pointe may be able to exclude coverage based on the acts or omissions by the Shorts, North Pointe is

estopped from raising those same contractual defenses against Chase.  For the following reasons, we disagree:

On May 26, 2011, Chase made a claim seeking insurance coverage under the Policy for "Accidental Discharge or Overflow of Water causing damage to Roofing, Walls – Ceiling or any other property" discovered on "02/15/10."  Chase Exh. 6 ("Notice of Claim").  Chase sought insurance coverage under the Policy for the same loss as the claim submitted by the Shorts in March 2010, to wit, water damage caused by the frozen pipe in the master bathroom.  However, North Pointe apparently believed Chase's claim was based on a separate issue involving water damage to the interior of the Property caused by wind damage to the roof from a possible hail incident in 1999.

In its claim summary report, North Pointe noted: "Loss is for water dmg. to the roof. Water has caused dmg. to roof and interior walls and ceiling of the home."  Chase Exh. 12.  In its letter acknowledging Chase's claim, North Pointe references the claim description as "water dmg to roof."  Chase Exh. 7.  As part of its investigation of Chase's claim, North Pointe sought a supplemental damages report from Davis Claims Service for "new" property damage (separate from the water damage resulting from the frozen pipe).  Although wind damage was not mentioned in any documents related to Chase's claim, the report from the investigator from Davis Claims Service indicates that he was told that "[t]he mortgage holder filed this as a wind damage claim resulting in water damage to the interior" and that he was asked to estimate "any new damage" to the Property caused, not by the frozen pipe, but by wind damage resulting in interior water damage.  Chase Exh. 8.

22

North Pointe represents that it is unaware of the reason for its claims personnel belief that the claim was based on wind damage to the roof.

After conducting its inspection, Davis Claims Service estimated the "new damage" to total $365.00, reporting: "There is a lot of water damage in the interior but all of it appears to be related to the frozen pipe and subsequent water damages which was the subject of the first claim." *Id.* On August 16, 2011, based solely on the estimate for "new damage," North Pointe issued its decision on Chase's claim, finding that coverage was owed, but that "your covered damages of $367.36 falls below your $1,000.00 policy deductible." Chase Exh. 9. The August 16, 2011 letter further stated that North Pointe "does not waive and shall not be estopped from asserting any exclusions or defenses available under policy number NPHM303743 …." *Id.*

Chase argues that, because North Pointe did not deny coverage on Chase's claim, but rather mistakenly determined that the loss fell below the deductible, North Pointe is estopped from now raising a defense of noncoverage against Chase or denying Chase's claim on any basis other than that originally provided, to wit, that the extent of damages does not exceed the deductible. From its earlier investigations and analysis of the Shorts' claim for the loss resulting from the frozen pipe, North Pointe had estimated the replacement costs of the Property to total $95,075.96 and the Shorts' adjuster estimated total property damages of $230,509.05,[8] both of which are far in excess of Chase's

---

[8] As noted above, North Pointe never paid the Shorts either amount because the adjusters were unable to reach a compromise regarding their differing damages estimates and North Pointe ultimately denied coverage under the Policy.

$1,000.00 deductible.  Thus, Chase argues that it is entitled to summary judgment on its claim.  In support of this contention, Chase cites the decision of the Indiana Court of Appeals in *Hermitage Ins. Co. v. Salts*, 698 N.E.2d 856 (Ind. Ct. App. 1998), for the proposition that an insurer may be estopped from raising coverage defenses when it had knowledge of the facts which would have permitted it to deny coverage, yet chose not to do so.

However, the facts in *Hermitage* are inapposite to the facts at bar.  In *Hermitage*, the insurance company defended its insured without a reservation of rights, conceded liability, and the issue of damages was tried to a jury.  Only after the verdict was reached and judgment entered did the insurance company raise the issue of exclusions under the policy in an attempt to reduce the judgment.  *Id.* at 860.

It is correct, as Chase argues, that under Indiana law, "with respect to insured-insurer disputes, when an insurance company assumes the defense of an action against its insured, without reservation of rights, and with knowledge of facts which would have permitted it to deny coverage, it may be estopped from subsequently raising the defense of noncoverage."  *Hermitage Ins. Co.*, 698 N.E.2d at 859 (collecting cases); *see also Protective Ins. Co. v. Coca-Cola Bottling Co. – Indianapolis – Inc.*, 423 N.E.2d 656, 661 (Ind. Ct. App. 1981) ("The failure of an insurer to disclaim liability or deny coverage as soon as it is reasonably possible after a demand to defend has been made may result in a waiver or estoppel.") (citations omitted).  These cases are not particularly instructive here, however, because the facts are not analogous to those before us.  As noted

24

previously, in *Hermitage*, the insurance company defended its insured without a reservation of rights, conceded liability, and the issue of damages was tried to a jury. Only after the verdict was reached and judgment entered did the insurance company raise the issue of exclusions under the policy in an attempt to reduce the judgment.  698 N.E.2d at 860.  In *Coca-Cola Bottling*, the insurance company failed for fifteen months to respond in any manner to its insured's demand to defend letter before notifying the insured of its refusal to defend.  423 N.E.2d 661-62.

Unlike those cases, the situation here does not involve the duty to defend.  Nor is it a case in which an insurance company sat back and waited before asserting any coverage defenses.  Instead, North Pointe investigated and rendered a denial on what it apparently believed to be a separate potential cause of loss and then added Chase as a party to this litigation so Chase's interest could be adjudicated at the same time as the Shorts' interest in the claim based on the damage from the frozen pipe.  Regardless of whether the earlier error was the result of a misunderstanding or even negligence on North Pointe's part, under the facts of our case, we cannot conclude that North Pointe is estopped from asserting its coverage defenses against Chase.

Chase contends that, under Indiana law, as a mortgagee listed under a standard mortgage clause, it "has entered into a separate contract with the insurer and is entitled to payment regardless of the mortgagor's acts or omissions."  *Hack*, 559 N.E.2d at 400.  However, this does not mean that Chase is automatically entitled to coverage under the mortgagee clause.  As the Policy provides, a "valid claim" must still exist, which, as

25

discussed above, remains to be determined.  Accordingly, Chase's summary judgment motion in this respect must be denied.

## II.      Motion for Leave to File Amended Complaint

On November 7, 2012, the Shorts filed a Motion for Leave to File an Amended Complaint and Cross-Claim for Declaratory Judgment, seeking to add a bad faith claim against North Pointe and to assert a cross-claim for declaratory relief against Chase to determine the parties' respective rights to the insurance proceeds.  The Shorts claim that these additional claims were first made known to them shortly before they filed their motion for leave to amend.

Federal Rule of Civil Procedure 15(a) provides that the court should "freely" grant leave to file an amended complaint "when justice so requires."  Fed. R. Civ. Pro. 15(a)(2).  Courts should allow pleading amendments "in the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *King v. Cooke*, 26 F.3d 720, 723 (7th Cir. 1994) (citations omitted).  In opposing an amendment, a defendant has "the burden of showing that the amendment is sought in bad faith, that it is futile, or that it would cause substantial prejudice, undue delay or injustice."  *Smith v. Chrysler Corp.*, 938 F. Supp. 1406, 1412 (S.D. Ind. 1996) (citations omitted).

## A. Bad Faith Claim Against North Pointe

With regard to the bad faith claim against North Pointe, the Shorts contend that they were made aware of the basis for that claim only after deposition testimony was taken on August 29, 2012, in which North Pointe's claims handling representative, Todd Wieczorek, and its underwriting representative, Amanda Krupin, revealed the existence of claims notes and underwriting notes that had not been previously produced to the Shorts.  On September 11, 2012, North Pointe produced the identified responsive documents to the Shorts.  The Shorts contend that it was only after their review of those notes that they discovered evidence to substantiate a bad faith claim against North Pointe. According to the Shorts, these notes reveal that North Pointe acknowledged at least by May 26, 2010, that there was evidence that the pipe burst due to freezing and yet made no effort to determine whether the "Freezing" peril in the Policy provided coverage, instead denying and for two years defending against the Shorts' claim solely under the vacancy provision of the "Accidental Discharge" peril.  The Shorts contend that North Pointe's actions caused them to incur unnecessary expenses in this action, including the hiring of an expert on frozen pipes and in incurring additional attorneys' fees to analyze the "vacancy" issue.

North Pointe contends that the court should not allow amendment at this late juncture due to the Shorts' undue delay in requesting the amendment, as well as undue prejudice resulting to North Pointe, and the futility of the proposed amendment.  We address these arguments in turn.

North Pointe first alleges that the Shorts unduly delayed filing their motion to amend as they had sufficient evidence on which to base a bad faith claim by at least July 2012, when they filed their brief in support of their motion for summary judgment and included allegations of bad faith in connection with their request for attorney's fees under Indiana's frivolous litigation statute.  Specifically, the Shorts alleged that North Pointe caused them to incur unnecessary attorneys' fees by refusing to properly analyze the coverage claims.

However, as the Shorts argue, the standard for showing bad faith sufficient to subject an insurer to a punitive damages award is a higher standard than that required under Indiana's frivolous litigation statute.  A bad faith claim requires "'evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.'" *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (quoting *Colley v. Indiana Farmers Mut. Ins. Group*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)).  Indiana's frivolous litigation statute, on the other hand, requires only that a party bring or continue to litigate a claim or defense that is "frivolous, unreasonable, or groundless." IND. CODE § 34-52-1-1(b).  The request for attorneys' fees contained in the Shorts' brief is easily distinguishable from the bad faith claim they seek to bring now, based on allegations that North Pointe intentionally withheld analysis of a coverage provision that it knew applied to the claim.  Accordingly, we cannot say that the Shorts had sufficient evidence to bring a bad faith claim at the time they filed their brief in support of their motion for summary judgment.  Nor are we persuaded that the

28

approximately two month delay between the time that the Shorts were provided the documents on which their bad faith claim is based and when they filed their motion to amend constitutes undue delay.

North Pointe also alleges that amendment would be futile because the statute of limitations has run on the Shorts' bad faith claim.  Both parties agree that a two-year statute of limitations applies.  *See* IND. CODE § 34-11-2-4(2) ("An action … for injury to personal property … must be commenced within two (2) years after the cause of action accrues.").  The discovery rule provides that "a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered than an injury had been sustained as a result of the tortious act of another."  *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992).  North Pointe contends that, because the Shorts' bad faith claim is based on the fact that North Pointe did not analyze their claim for coverage under the Freezing provision of the Policy, the Shorts were on notice of their potential claim at the time they received North Pointe's denial letter on September 15, 2010, which provided that their claim was being denied solely under the vacancy provision contained in the Accidental Discharge peril of the Policy.

We are not persuaded that the denial letter alone could have alerted the Shorts to a potential bad faith claim.  Under Indiana law, an insurer may dispute or deny coverage in good faith.  *See Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind. 1993) ("That insurance companies may, in good faith, dispute claims, has long been the rule in

29

Indiana.") (citations omitted).  Accordingly, there is nothing about the fact that North Pointe initially denied the claim that would have sufficed to put the Shorts on notice of a potential bad faith claim.  Although North Pointe characterizes the Shorts' bad faith claim as being based solely on the fact that North Pointe did not analyze their claim for coverage under the Freezing provision in the Policy, that characterization is not entirely accurate.  Rather, the Shorts' bad faith claim is based on the allegation that North Pointe intentionally failed to or refrained from analyzing the claim under the Freezing provision, despite having knowledge that the cause of the loss was a frozen pipe.  There is no indication that the denial letter itself would have alerted the Shorts to these facts.

Alternatively, North Pointe argues that the Shorts have known about the existence of the relevant claims notes long before they were used to assist Todd Wieczorek at his August 29, 2012 deposition, relying on the fact that North Pointe served its discovery responses on November 23, 2011, and indicated that "any and all reserve analysis, log or diary notes and communication between insurance adjusters and supervisors are protected from disclosure."  Docket 104 at 4.  However, North Pointe never identified the relevant claims notes on a privilege log provided to the Shorts, and, when it subsequently turned the notes over to the Shorts after they were used at Mr. Wieczorek's deposition, North Pointe made no attempt to assert any privilege at that time.  Given these facts, up until the point that the notes were produced at Mr. Wieczorek's deposition, it was reasonable for the Shorts to have believed that they had been provided all non-privileged, responsive documents.  It is not clear to us in what manner the Shorts could have been alerted to any

potential bad faith claim based solely on North Pointe's discovery response.  North Pointe cannot now argue undue delay when its own failure to produce the notes, which are apparently relevant, responsive, and non-privileged, was what caused the delay.

North Pointe also contends that they will be subjected to undue prejudice if the Shorts are allowed to amend their complaint.  If the amendment is allowed, North Pointe asserts that it would "at a minimum need to re-conduct the deposition of Robert Short, depose the individuals at Midwest Remediation that spoke with North Pointe representatives about the claim, and depose Terrance Trapane who spoke with Robert Short and conducted his EUO in order to determine what Robert and Janet Short were told when in regard to the different possibilities for their cause of loss."  Docket 104 at 3. Initially, we are not persuaded that North Pointe will need to depose those individuals in order to determine the timing of the *Shorts'* knowledge of the cause of the loss as it is clear that "[w]hen evaluating an allegation of the breach of the duty of good faith, the focus must be on *the insurer's actions* pertaining to the claims with its own contracted party …." *State Farm Mut. Auto Ins. Co. v. Sellers*, 854 F. Supp. 2d 609, 625 (N.D. Ind. 2012) (emphasis added).  Moreover, as noted above, had North Pointe disclosed the relevant claims notes on which the Shorts' bad faith claim is based during the discovery process, as it appears (at least on the facts currently before us) it should have done, this delay likely would have been avoided.  Accordingly, we find North Pointe's claim of undue prejudice unavailing.

### B.  Cross-Claim for Declaratory Relief Against Chase

Chase contends that the Shorts' request for leave to amend to add a cross-claim for declaratory judgment against Chase should also be denied because such an amendment is both futile and the product of undue delay.

We turn first to the question of futility.  An amendment is futile if it fails to state a claim under the Rule 12(b)(6) standard.  *See Jones v. Psimos*, 882 F.2d 1277, 1285 (7th Cir. 1989).  Federal courts can hear declaratory judgment claims where there exists "'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'"  *Doe v. Prosecutor, Marion County, Ind.*, 566 F. Supp. 2d 862, 870 (S.D. Ind. 2008) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Chase argues that, here, there is no real controversy between it and the Shorts, and thus, amendment would be futile.  We agree that there is no justiciable controversy regarding Chase's entitlement to insurance proceeds for the Shorts' personal property as Chase concedes that it is not entitled to recover any amounts for personal property damage.  However, a justiciable controversy does exist between Chase and the Shorts regarding the validity of the mortgage and their respective rights and entitlement to insurance proceeds that may be payable for the dwelling.  Although Chase has put forth a number of arguments attacking the merits of the Shorts' proposed declaratory judgment claim, in order to be granted leave to amend their complaint, the Shorts need not prove that their claim will ultimately be successful, only that it is not futile, which they have done.

Chase also argues that the Shorts should not be permitted to amend their complaint because of undue delay.  Chase contends that the Shorts' claim is untimely because the Mortgage was signed in 1998 and the Policy was signed in 2009, and thus, the Shorts had knowledge of the language at issue in those contracts for years before the instant dispute arose in 2010 and should have been aware of all of the contractual issues that they now attempt to raise long before they moved to amend.  The Shorts, on the other hand, argue that, although Chase is correct that the language of the Mortgage and the Policy has remained the same since those documents were signed, the Shorts were not aware of a potential disagreement as to the meaning of that language until October 4, 2012, when Chase and North Pointe conducted settlement discussions without the Shorts.  The Shorts sought to amend their complaint approximately one month later.

"[D]elay alone will not generally justify denying a motion to amend a pleading absent a showing of prejudice from the delay."  *King*, 26 F.3d at 723 (citations omitted).  Chase has pointed to no prejudice it will suffer if the Shorts are permitted to amend their complaint.  It is true that "when extreme, 'delay itself may be considered prejudicial,'" *Tamari v. Bache & Co.*, 838 F.2d 904, 909 (7th Cir. 1988) (quoting *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 139 (1st Cir. 1985)), but we are not persuaded such extreme delay is implicated here, given that the Shorts filed their motion to amend within a month of becoming aware that there was a dispute between their interpretation of the provisions of the Mortgage and the Policy and Chase's.

## III.    Conclusion

For the reasons detailed in this entry, Chase's Motion for Summary Judgment is DENIED.  The Shorts' Motion for Summary Judgment is GRANTED as to the issue of rescission of the Policy as a result of misrepresentations on the application, but DENIED on all remaining grounds.  North Pointe's Motion for Summary Judgment is GRANTED as to the issue of coverage under the accidental discharge provision, but DENIED on all remaining grounds.  The Shorts' Motion to Amend is GRANTED.  The cause of action will proceed accordingly.

IT IS SO ORDERED.

Date:   04/29/2013

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


Brian Scott Jones
BOSE MCKINNEY & EVANS, LLP
b.jones@boselaw.com

Curtis T. Jones
BOSE MCKINNEY & EVANS, LLP
cjones@boselaw.com

Theodore J. Nowacki
BOSE MCKINNEY & EVANS, LLP
tnowacki@boselaw.com

Elizabeth J. Wysong Berg
GOODIN ABERNATHY LLP
eberg@goodinabernathy.com

James A Goodin, Jr.
GOODIN ABERNATHY LLP
jgoodin@goodinabernathy.com

George M. Plews
PLEWS SHADLEY RACHER & BRAUN
gplews@psrb.com

Tonya J. Bond
PLEWS SHADLEY RACHER & BRAUN
tbond@psrb.com

Katherine K. Schuman
PLEWS SHADLEY RACHER & BRAUN LLP
kschuman@psrb.com